CHARLES H. GIBSON AND SANDRA D. WILSON, F.K.A. SANDRA D. GIBSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gibson
Docket No. 17554-90
United States Tax Court
T.C. Memo 1992-351; 1992 Tax Ct. Memo LEXIS 374; 63 T.C.M. (CCH) 3161; June 22, 1992, Filed *374 Decision will be entered under Rule 155. George W. Connelly, Jr. and Robert I. White, for petitioner Charles H. Gibson. James H. Sackrider, for petitioner Sandra D. Wilson. Sheri Wilcox, for respondent. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661
1982
$ 29,265
$ 23,314
[1]
$ 7,316
1983
75,410
37,705
[1]
18,853
After concessions, the issues for decision are: 1. Whether petitioners Charles H. Gibson and Sandra D. Wilson are each liable for additions to tax for fraud pursuant to section 6653(b)(1) and (2) [1] for 1982 and 1983. We hold that they are. *375 2. Whether petitioners are liable for additions to tax for 1982 and 1983 for substantial understatement of tax under section 6661. We hold that they are. FINDINGS OF FACT 1. Petitioners
Petitioner Charles H. Gibson (Gibson) resided in Houston, Texas, and petitioner Sandra D. Wilson (Wilson) resided in Pacific Palisades, California, when the petition was filed. Petitioners were married from February 1974 to May 1990. Petitioners filed income tax returns for 1982 on May 24, 1984, and for 1983 on October 15, 1984. Their 1983 return was timely filed pursuant to an extension. a. Gibson's Employment With Communications Advisors, Inc.
During 1982 and 1983, Gibson was employed by Communication Advisors, Inc. (CAI). Petitioners reported $ 113,914 in draws from CAI on their 1982 income tax return. Petitioners reported wages and draws from CAI totaling $ 130,320 on their 1983 income tax return. b. Wilson's Handling of the Family Finances
Wilson attended 3 years of college. She was employed in real estate sales from 1971 to 1981. Wilson was a capable businesswoman. She handled the family finances. Wilson was well informed about CAI, but did not participate *376 directly in it. During 1982 and 1983, Wilson managed five rental properties owned by petitioners, and maintained their house and ranch. She arranged for the financing of most of these rental properties by assuming existing mortgages. Petitioners bought the ranch in 1983. Wilson located, arranged for the purchase of, and rented the rental properties, collected the rents, paid the bills, arranged for repairs, and provided information about the rental properties to petitioners' certified public accountant, Larry Morris. During this time, Wilson was also raising two children from a prior marriage, and handling the normal duties of child rearing. Wilson was hindered in her efforts to manage petitioners' household finances for several reasons. Gibson was not paid a regular draw. Petitioners' account was consistently overdrawn. CAI personnel made many deposits to their account, which she discovered only when she received the monthly bank statements. 2. Communications Advisors Inc.
Gibson and Kay Dean Warfield (Warfield) had been business acquaintances since the mid-1970s. In 1979 Warfield helped Gibson resolve problems with a company called General Communications Design. *377 Later, they formed a consulting company called BTI. On January 21, 1980, Gibson and Warfield formed CAI. Petitioners owned 50 percent of the stock of CAI. The remaining 50 percent was owned by Warfield and his wife, Suzanne J. Warfield (the Warfields). The stockholders did not make any capital contributions to CAI beyond an initial $ 1,000 capitalization. During the years in issue, the officers and directors of CAI were Gibson, Wilson, and the Warfields. CAI was in the business of telecommunications consulting. CAI analyzed a client's needs, consulted with possible vendors, and recommended to the client the appropriate communications equipment and vendor to install the equipment. Gibson and Warfield agreed that Gibson would be responsible for most of the sales activities and Warfield would be responsible for the technical and administrative activities. As a result, Gibson was out of town most of the time. Warfield was responsible for CAI's finances. In 1982 and 1983, CAI's office was located at the Warfields' ranch in Brookshire, Texas. All CAI records were kept there during 1982 and 1983. Gibson and Warfield spoke almost every day. They discussed business decisions *378 by telephone or in person. Warfield often made decisions for CAI, consulting with Gibson on some of them. "Engineering fees" were paid to Gibson and Warfield by vendors of telephone systems to secure CAI's recommendation of the vendor to a CAI customer. The customary engineering fee was 5-10 percent of the equipment sales price. As discussed below, some of these payments were sent to bank accounts in the Cayman Islands, and then withdrawn by petitioners for their personal use. CAI employed Anne Rowden (Rowden) as an executive secretary and office manager from April 1981 to October 1984. Rowden maintained CAI's records, invoiced clients, maintained CAI's checkbook and check register, deposited funds, and handled accounts payable when Warfield was out of the office. Warfield directed Rowden with respect to the invoicing, and told her where to deposit the money. During the years in issue, Gibson and Warfield did not receive a regular salary. They were compensated by "draws" based on a division of the funds remaining after the payment of other CAI expenses. The actual division of funds was more favorable to Warfield. Most of Gibson's draw checks were deposited in petitioners' *379 personal bank account by Warfield or Rowden, although some were delivered to petitioners. CAI also paid personal expenses for Gibson and Warfield such as utilities, telephone, ranch help, and car expenses. Gibson and Warfield jointly decided to pay personal expenses from the CAI account. Employees of CAI were authorized to sign Gibson's name to credit card slips and his correspondence when he was traveling. Warfield did not go over the CAI books with petitioners. During periods of conflict between Warfield and Gibson, Warfield sometimes denied Gibson access to CAI's books. 3. World Wide Telecommunications and the Cayman Islands Bank Accounts
In 1981, Warfield and Gibson became interested in obtaining foreign clients. On the advice of CAI's attorney, Jim Shoemake (Shoemake), Gibson and Warfield decided to form a corporation and to open a bank account in the Cayman Islands, B.W.I. On September 18, 1981, the Warfields, Rowden, and one of CAI's attorneys, William Tinch, went to the Cayman Islands, where they formed World Wide Telecommunications, Ltd. (WWT), a foreign corporation. The Warfields and petitioners were the directors of WWT from at least December 22, 1982. *380 On September 19, 1981, WWT opened an account at the Bank of Nova Scotia, Grand Cayman (the WWT Cayman Islands account). Petitioners and the Warfields had signature authority on the WWT Cayman Islands account. Petitioners signed the signature card for the WWT Cayman Islands account on or before December 21, 1982. WWT records were maintained at the Warfields' ranch. The records included a check ledger, bank statements with canceled checks, copies of letters from Cayhaven Management, WWT invoices for engineering fees, and blank WWT invoices. 4. Use of WWT's Cayman Islands Account for Engineering Fees Received by CAI
Efforts were made to obtain consulting contracts with foreign entities, but WWT did not secure any consulting contracts or earn any income. Instead, Gibson and Warfield used the WWT Cayman Islands account as a repository for the engineering fees they received on CAI contracts. Both Warfield and Gibson knew CAI was sending engineering fees to the WWT Cayman Islands account. Warfield and Gibson decided that engineering fees would be deposited to the WWT Cayman Islands account based on whether the funds were needed for CAI's operations. Warfield instructed Rowden *381 to prepare the WWT invoices. Gibson did not direct Rowden to prepare WWT invoices. WWT issued invoices for engineering fees totaling $ 123,420 to Universal Communications Systems, Inc. (UCSI), from October 20, 1981, to April 19, 1982. USCI issued checks totaling $ 123,420 to WWT in payment of these invoices. All of the USCI checks were deposited in the WWT Cayman Islands account. WWT issued invoices for engineering fees totaling $ 119,800 to National Business Communications Corp. (NBCC) in October 1982. NBCC issued checks totaling $ 66,580 to WWT in partial payment of these invoices. Of the NBCC checks, $ 34,580 was deposited in the WWT Cayman Islands account, $ 27,000 was deposited in CAI account number 05-063039-2 (the CAI account) at Katy Savings and Loan Association (Katy S&L), and Wilson deposited $ 5,000 ($ 2,500 of which was withheld in cash) to account number 06-060191-4 (petitioners' account) at Katy S&L. WWT and CAI issued invoices for engineering fees totaling $ 546,684.55 to Communications Corp. of America (CCA). CCA issued checks totaling $ 541,364.17 to WWT and CAI. Of the CCA checks, $ 91,133.02 was deposited to the WWT Cayman Islands account, $ 41,454.25 *382 was used to purchase a money order from Katy S&L which was then deposited to the WWT Cayman Islands account, $ 202,806.10 was used, in part, to purchase a $ 187,806.10 cashier's check from Katy S&L, which was then deposited in the WWT Cayman Islands account, $ 102,490 was deposited in the CAI account at Katy S&L, and $ 51,740.40 was deposited to both petitioners' and the Warfields' accounts at Katy S&L. During the years in issue, CAI and WWT received engineering fees totaling $ 731,364.17 from Universal Communications Systems, NBCC, and CCA. Of the $ 731,364.17, $ 478,393.37 was deposited to the WWT Cayman Islands account, $ 56,740.40 was deposited to petitioners' account at Katy S&L, $ 51,740.40 was deposited to Warfield's account at Katy S&L, and $ 144,490 was deposited to the CAI account at Katy S&L. Gibson knew generally about these transactions, and Wilson knew about them to the extent that they affected petitioners' bank account. 5. Petitioners' and Warfields' Personal Cayman Islands Accounts
Petitioners and the Warfields went to the Cayman Islands from December 17-21, 1982, to open personal bank accounts at the Bank of Nova Scotia, Grand Cayman. Petitioners and *383 the Warfields used these accounts to get money from WWT for their personal use. On December 21, 1982, petitioners opened account number 3153-11 (petitioners' Cayman Islands account), and the Warfields opened account number 2780-17 (the Warfields' Cayman Islands account), at the Bank of Nova Scotia. The Warfields and petitioners opened these accounts rather than depositing the money from the WWT Cayman Islands account to their existing Texas bank accounts in an attempt to prevent the Internal Revenue Service (IRS) from finding out about the money. During 1982 and 1983, the following checks were drawn on the WWT Cayman Islands account payable to petitioners and the Warfields: Date
Check Payable to:
Amount
4/5/82
S. Gibson
$  6,000.00
4/5/82
S.J. Warfield
6,000.00
12/21/82
K.D. Warfield
35,342.51
12/21/82
Chuck Gibson
35,342.51
12/27/82
Sandra Gibson
12,500.00
12/27/82
Suzanne Warfield
12,500.00
1/5/83
Sandra Gibson
20,000.00
1/5/83
Suzanne Warfield
20,000.00
7/22/83
K.D. Warfield
3,000.00
7/22/83
Sandra D. Gibson
3,000.00
9/12/83
Charles H. Gibson, Jr.
52,150.00
9/12/83
Bank of Nova Scotia
(for K.D. Warfield)
45,000.00
9/12/83
K.D. Warfield
7,150.00
*384 On February 14, 1983, $ 20,000 was transferred from the WWT Cayman Islands account to petitioners' and the Warfields' Cayman Islands accounts. The Warfields deposited WWT checks totaling $ 70,842.51 in their Cayman Islands account. Similarly, petitioners deposited WWT checks totaling $ 70,842.51 in their Cayman Islands account. Petitioners both knew that the deposits came from the WWT Cayman Islands account. 6. James T. Kelley
James T. Kelley (Kelley) was a senior vice president of the Hyatt Hotel Corp. He approved all consulting contracts with CAI for work in Hyatt Hotels. Hyatt was CAI's biggest customer in 1982 and 1983. Eighty-five thousand dollars was withdrawn from the WWT Cayman Islands account in the form of a check dated September 12, 1983, payable to Kelley (the Kelley check). The Kelley check was written by Warfield at the behest of Gibson. Gibson told Warfield that Kelley knew that CAI was receiving engineering fees on the Hyatt Hotel contracts and that Kelley wanted to be paid $ 85,000 for his assistance in getting the contracts for CAI. Warfield wrote the check and gave it to Gibson. Gibson gave the check to Kelley in the Bank of Nova Scotia when Kelley *385 was opening a bank account. The balance in Kelley's Cayman Islands account was $ 86,000 on August 2, 1984. Petitioners did not receive any of this amount. 7. Distributions to Petitioners from the WWT Cayman Islands Account
Of the $ 478,393.37 deposited to the WWT Cayman Islands account, petitioners and the Warfields each received $ 148,992.51. Petitioners used approximately $ 116,000 of the $ 148,992.51 as follows: a. Petitioners used $ 40,000 on February 14, 1983, to purchase a Bank of Nova Scotia bank draft payable to Thomas D. Chance (Chance), the president of Katy S&L, to apply towards the $ 83,000 loan on their ranch. [2] This draft was deposited in petitioners' account at Katy S&L on February 15, 1983. b. Petitioners used $ 35,000 to invest in W.D. Investment Corp. of Texas. On February 15, 1983, Wilson wrote a $ 35,000 check payable to W.D. Investment Corp. c. Petitioners *386 used $ 41,000 to purchase at least $ 27,615 of gold and more than $ 13,000 of Krugerrand coins. d. Gibson also brought cash back to the United States. Both petitioners knew about these uses of funds from their Cayman Islands account. 8. The November 10, 1983, Meeting and CAI's Tax Returns
CAI was incorporated in 1980, but did not file any tax returns until 1984. Warfield and Gibson decided not to file returns for CAI before 1984 to avoid drawing respondent's attention to the fact that petitioners and the Warfields had not filed personal income tax returns. Wilson was aware of this decision and the reasons for it. On November 10, 1983, when Warfield was out of town, Gibson went to the Warfields' ranch and asked Rowden to show him the CAI records. Gibson reviewed the company checkbook but did not examine other records. On November 10, 1983, there was a meeting of the CAI board of directors at the Warfields' ranch (the November 10 meeting). Present at the meeting were the Warfields, petitioners, Warfield's present wife Monique, Rowden, Chance, and Shoemake. Petitioners expressed dissatisfaction with Warfield's handling of the business and expressed their desire to *387 become more involved. Those present at the meeting agreed that Shoemake and Rowden would assemble the records for CAI and WWT and give them to a certified public accountant, Larry Morris (Morris), and that delinquent income tax returns for CAI, the Warfields, and petitioners would be filed. Shoemake advised those present at the November 10 meeting that use of the WWT Cayman Islands account be discontinued, that the money deposited in the WWT Cayman Islands account be included in income on the CAI and individual shareholders' returns, and that all returns be filed. Shortly before the November 10 meeting, the IRS had contacted CAI about its failure to file employment and income tax returns. CAI's recordkeeping procedures were changed after the November 10 meeting. Warfield was removed as a signatory on CAI's bank accounts, Warfield and Gibson were placed on salary, no personal expenses were to be paid from CAI's bank account, and weekly meetings were held with Shoemake and Chance to make financial decisions for the company. However, during the following year, Gibson and Warfield resumed their former practice of making the financial decisions for CAI. CAI did not have a set of *388 books when Rowden began working there, and did not have a complete set until after Morris filed the returns. Rowden and Warfield gave the existing records to Morris. Warfield and Rowden gave information to Morris to prepare the return. They gave Morris CAI ledger sheets listing the checks written by category and cash receipts for the fiscal years ended January 31, 1981 and 1982, and check copies, bank statements, and deposit slips for the fiscal years ended January 31, 1983 and 1984. [3] Morris prepared general ledgers for the 1983 and 1984 fiscal years from these records. Rowden sometimes checked with Warfield and Gibson to get answers to Morris' questions. Neither petitioner provided corporate records to Morris for this purpose, and there was no understanding that either petitioner would do so. Morris did not ask them for any CAI information. Warfield, Rowden, Shoemake, and petitioners did not tell Morris about WWT *389 or any banking activities in the Cayman Islands. No one gave Morris any WWT records. Rowden believed she was to provide Morris with information about CAI only. Neither Warfield nor Gibson told her to give Morris information about WWT. Morris first learned of the Cayman Islands transactions when he was interviewed by an IRS special agent. Warfield and Gibson knew that the amounts deposited in the WWT bank account were not reported on the CAI income tax returns prepared by Morris. CAI's income tax returns for fiscal years 1981 through 1983 were prepared on the cash basis method of accounting; its return for fiscal year 1984 was prepared on the accrual method of accounting. CAI's current earnings and profits were $ 4,827.47, $ 67,564.54, $ 220,799.01, and $ 52,103.37, for fiscal years 1981 through 1984, respectively. CAI's accumulated earnings and profits for fiscal years 1981 through 1984 were $ 0, $ 4,827.47, $ 58,507.01 and $ 161,618.02, respectively. 9. Petitioners' Tax Returns
Petitioners had Morris prepare their individual income tax returns for 1978 through 1983. Petitioners had a history of tax delinquency that predated the creation of CAI. Petitioners did *390 not file income tax returns for 1978 and 1979, the years preceding the creation of CAI, until after they hired Morris following the November 10 meeting. During his meeting with petitioners, Morris asked petitioners to provide him with information related to their income and expenses. Petitioners gave him their bank records and all information he requested relating to income, but they gave him no information about WWT. Morris used the information from CAI to compute petitioners' income from CAI. Petitioners did not tell Morris that they were concerned about either Warfield's handling of CAI's financial matters or the information given to Morris to prepare the CAI returns. Petitioners did not tell Morris about WWT or their personal bank account in the Cayman Islands, and Morris did not ask about it. Petitioners did not ask Morris to review their returns with them. Petitioners did not report any income from WWT on their 1982 or 1983 income tax returns. Petitioners stated on their 1986 income tax return, Schedule B, question 10, that they did not have an interest in or a signature or other authority over a financial account in a foreign country during 1986 when they did, in fact, *391 have an account in the Cayman Islands. Petitioners reported gross income of $ 125,433 in 1982 and $ 144,438 in 1983. Petitioners omitted gross income of $ 69,513 in 1982, and $ 144,396 in 1983. For both years, the amount omitted from gross income exceeded 25 percent of the gross income reported on the return. Petitioners did not disclose on their return or in an attached statement that they omitted income from their 1982 and 1983 returns. OPINION 1. Fraud
Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Respondent must establish: (1) That petitioners have underpaid taxes for each year, and (2) that some part of the underpayment was due to fraud. . Respondent need not prove the precise amount of the underpayment resulting from fraud. . The statute requires only a showing that "any part" of an underpayment results from fraud. Sec. 6653(b) and (c). Fraud is never presumed; rather, it must be established by affirmative evidence. . *392 Fraud may be inferred from any conduct, the effect of which would be to mislead or conceal, , or where an entire course of conduct establishes the necessary intent, , affg. ; ; . The sophistication of the taxpayer is relevant to the determination of fraud. , affg. . Fraud may also be proven by circumstantial evidence (including the implausibility of the taxpayer's explanations, , affg. a Memorandum Opinion of this Court), because direct evidence of the taxpayer's intent is rarely available, . For purposes of section 6653(b), fraud means "actual, intentional wrongdoing," , *393 or the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing, , affg. ; , affd. . Fraud is not imputed from one spouse to the other. In the case of a joint return, respondent must prove fraud as to each spouse. Sec. 6653(b); , affd. ; . We find many clear indicia of fraud present in this case. Gibson and Wilson were knowing parties to and helped implement a plan to divert engineering fees to a CAI bank account in the Cayman Islands. They went to the Cayman Islands, opened a bank account so they could use these funds, and withdrew substantial sums from it for their personal use. Petitioners were both aware that funds from Gibson's employer were being deposited in their Cayman Islands account in 1982 and 1983. They failed to report *394 substantial amounts of income in 1982 and 1983. Petitioners failed to give their accountant all the information necessary to adequately complete their returns. For example, petitioners did not tell Morris about their Cayman Islands bank account, claiming they thought Warfield and Rowden had fully informed Morris of their income. Petitioners also failed to review their tax returns. Petitioners' contention that they opened their personal bank account in the Cayman Islands to have funds available during Gibson's trips there on business is not convincing. We conclude that they opened it as part of their scheme to obtain these funds for personal use. Petitioners assert that they are not liable for fraud because they relied on Morris to prepare accurate returns. It is true that a taxpayer's reliance on an accountant to prepare income tax returns may indicate an absence of fraudulent intent. . However, reliance is not an acceptable defense to fraud where the taxpayer has failed to supply all of the necessary tax information. , affg. *395 in part and revg. in part ; ; . Petitioners blame Warfield for the nonreporting of income routed through their Cayman Islands account. Petitioners claim that they each tried to get the records from Warfield to file their returns, but he denied access to them. Gibson argues that Warfield controlled the engineering fees and decided to use WWT as a repository for those funds, and that Gibson had no knowledge of Warfield's invoicing scheme. Petitioners contend they were told by Warfield that the money received from WWT was a loan, and not taxable until brought into the United States. Petitioners also claim they relied on Warfield to ensure that all tax return information was handled properly. Petitioners want to have it both ways. On one hand, they maintain that Warfield denied Gibson access to CAI's business records and failed to treat Gibson honestly, and that CAI's failure to file corporate income tax returns was the result of Warfield's efforts to hide the fact that he had not filed his own returns. On the *396 other hand, they wish to be exonerated from responsibility on the grounds that they trusted Warfield to fully and honestly disclose all relevant information to their tax preparer. Gibson's claimed reliance on Warfield to provide records to Morris belies his claim that he had long mistrusted Warfield. We believe the business relationship between Warfield and Gibson had deteriorated by the time of the November 10 meeting, but we do not believe that petitioners' conduct is excused by any denial of access to business records. Petitioners deny knowing the income from WWT was not reported on their returns for the years at issue, and they blame the omission on Warfield and their accountant. However, petitioners never gave the records to Morris, and they never reviewed their income tax returns. Wilson claimed she told Morris about petitioners' Cayman Islands bank account. Her testimony was equivocal and was contradicted by Morris, whom we find more credible on this point. Petitioners deny knowledge that some of the funds withdrawn from their joint Cayman Islands account were used for their personal benefit. They deny knowledge that $ 40,000 from their Cayman Islands account was used *397 as payment on their loan for their ranch. Wilson's claim that petitioners did not use the funds from petitioners' Cayman Islands bank account to make a payment on this loan is not believable in light of the documentation from Katy S&L, the independent testimony of the bank teller, Jackie Divins, and the testimony of Warfield that Wilson told him she used $ 40,000 to make a payment on the ranch. Jackie Divins testified that she saw Wilson deposit the $ 5,000 NBCC check in petitioners' account at Katy S&L. Wilson's testimony that she did not deposit this or any check payable to WWT into her account at Katy S&L is not credible in light of Jackie Divins' independent recollection of the circumstances of this deposit. Gibson says he knew that the money in petitioners' Cayman Islands account was taxable when it was transferred to him, but he did not report any of that money on his returns. We believe that petitioners were knowing and willing participants in this scheme to evade income taxes. Petitioners each appeared to be capable businesspersons. Gibson started several business enterprises, and, with CAI, operated independently consulting with major businesses regarding sophisticated *398 telephone systems. Wilson managed five properties, handling financing arrangements, rentals, repairs, etc., and handled the family finances as well. She was reasonably knowledgeable about CAI's business affairs. Both petitioners had the ability to understand their own income, tax obligations, and tax returns. Based on the entire record in this case, we hold that respondent has clearly and convincingly proven that petitioners' understatements of income for 1982 and 1983 were due to fraud. 2. Addition to Tax for Substantial Understatement
Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax in any given taxable year. A substantial understatement exists if in any year the amount of the understatement exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown on the return. Sec. 6661(b)(1). An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2). If the taxpayer has substantial authority for his tax treatment of any item *399 on the return, the understatement is reduced by the amount attributable thereto. Sec. 6661(b)(2)(B)(i). Similarly, the amount of the understatement is reduced for any item adequately disclosed either on the taxpayer's return or in a statement attached to the return. Sec. 6661(b)(2)(B)(ii). Petitioners contend that respondent should have waived the addition to tax under section 6661 because there was reasonable cause and they acted in good faith in relying on their CPA in filing their 1982 and 1983 returns. Petitioners omitted large amounts of income from their 1982 and 1983 joint returns, and substantial understatements of income tax resulted. The $ 69,513 and $ 144,396 amounts received by petitioners were not disclosed on their 1982 and 1983 returns. Petitioners have cited no authority for their failure to report those items of income. There is no abuse of discretion by respondent in refusing to waive the addition, and there is no showing of reasonable cause by petitioners for the understatements and that they acted in good faith. Accordingly, respondent's determinations as to the section 6661 addition to tax are sustained. Decision will be entered under Rule 155. *400 Footnotes
1. Fifty percent of the interest computed on $ 22,970 and $ 60,857 of the deficiency for taxable years 1982 and 1983, respectively.↩
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners borrowed $ 83,000 from Katy S&L on May 23, 1983, to pay part of the purchase price of their ranch, Ranchito Rojo.↩
3. A reference hereafter to "1981", for example, is to the taxable year ended January 31, 1981.↩